**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**CIVIL DOCKET NO.: 5:04CV95-V**

| | | |
|---|---|---|
| **TODD BLAKE WOODSIDE,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Memorandum and Order** |
| | ) | |
| **SHERIFF PHILLIP REDMOND, CAPTAIN** | ) | |
| **RICK DOWDLE, CORPORAL FNU** | ) | |
| **"MURPH" MURPHY, individually and in** | ) | |
| **his official capacity, SERGEANT TRAVIS** | ) | |
| **WARD, individually and in his official** | ) | |
| **capacity, FIDELITY and DEPOSIT CO. OF** | ) | |
| **MARYLAND, surety for SHERIFF** | ) | |
| **REDMOND, and DOES 1 - 10,** | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** comes before the Court on Defendants' Motion For Summary

Judgment and Memorandum In Support, filed April 16, 2007.  (Documents #24, #25)  On

August 10, 2007, Plaintiff filed a brief in opposition to Defendants' motion.[1]  (Document

#29)  Defendants' reply was filed on August 20, 2007.  (Document #30) This matter is now

ripe for disposition.

### I.  Nature Of The Case

Plaintiff Todd Blake Woodside ("Plaintiff" or "Woodside") brings this civil action

pursuant to 42 U.S.C. §1983.   In July 2002, Plaintiff was involved in a single vehicle

(motorcycle) accident in Iredell County, North Carolina.  Plaintiff, who had been drinking,

was treated at the scene but refused to be transported to the hospital.  Plaintiff was

---

[1] Plaintiff did not respond to Defendants' motion until directed to do so by the Court.
(Document #27)

charged with (and later pled guilty to) driving while impaired, taken into custody as a pretrial detainee, and transported to the Iredell County Jail. Plaintiff asserts that he became seriously ill during the night and that his pleas for help were essentially ignored. Plaintiff contends deputies used excessive force by slamming him against the cell wall and cuffing him to a corner of his bunk. Plaintiff further asserts that Defendants' conduct reflects a deliberate indifference to Plaintiff's serious medical needs.[2]

## II. Undisputed Facts

Plaintiff stipulates to Defendants' "Statement of the Facts." (*See* Pl.'s Resp. In Opp'n at 1.) The Court hereby incorporates by reference Defendants' recitation of the facts, which are viewed in the light most favorable to the Plaintiff:

On June 18, 2002, Woodside attended a pool party at a friend's house. (Woodside Dep. at 12). Over the course of four to five hours, Woodside Dep. at 12, Woodside consumed six to eight sixteen ounce beers, Woodside Dep. at 12, Smith Aff. at Ex. A.

After leaving the party, Woodside was involved in a single vehicle accident on Autumn Leaf Road in Troutman, North Carolina. (Smith Aff. at Ex. A). As he was driving his Yamaha scooter, Woodside ran off the road and struck a mulch pile. (Woodside Dep. at 11). Woodside lost consciousness as a result of the crash. (Woodside Dep. at 11). Upon regaining consciousness, Woodside recalls being treated by Emergency Medical Technicians from the Troutman Fire and Rescue. (Woodside Dep. at 11).

---

[2] The Court's Memorandum and Order dated June 5, 2006 contains an overview of Plaintiff's allegations. (Document #15)

North Carolina State Trooper R.D. Smith arrived on the scene while Woodside was receiving medical treatment. (Woodside Dep. at 12). Trooper Smith proceeded to speak with Woodside; Trooper Smith noticed a strong odor of alcohol on Woodside's breath and his speech was slurred. (Smith Aff. at ¶ 5). While Trooper Smith was speaking with Woodside, Trooper Smith overheard Woodside tell the paramedic attending to him that he was not injured and did not need to be transported to the hospital. (Smith Aff. at 7). Trooper Smith proceeded to ask Woodside if he had suffered any injuries; Woodside responded that he had not. (Smith Aff. at ¶8).

Based upon his observation of Woodside, Trooper Smith believed Woodside to be impaired. (Smith Aff. at ¶¶ 6 & 11). Trooper Smith proceeded to arrest Woodside for Driving While Impaired.[3] (Smith Aff. at ¶ 9). After the arrest, Trooper Smith transported Woodside to the Iredell County Jail. (Smith Aff. at 10; Woodside Dep. at 13-14). Once at the Iredell County Jail, Woodside refused to submit to a chemical analysis of his breath. (Smith Aff. at 13; Woodside Dep. at 14-15). A Magistrate Judge set Woodside's bond and Woodside was admitted into the Iredell County Jail. (Woodside Dep. at 14, 16; Ward Aff. at ¶ 8). After being processed into the Iredell County Jail, Woodside was placed in holding cell 146 near the processing area. (Ward Aff. at 9).

Approximately forty-five minutes after being placed in the holding cell, Woodside claims he began experiencing "excruciating pain across [his] midsection…." (Woodside Dep at 16). Woodside claims he began spitting up blood. (Woodside Dep. at 17). Woodside claims he spit up blood intermittently while incarcerated at the Iredell County Jail. (Woodside Dep. at 25). Allegedly, Woodside spit up so much blood that his arms and legs were "caked" in blood. (Woodside Dep. at 35).

---

[3] Woodside subsequently pled guilty to these charges. (Woodside Dep. at 9-10).

Woodside rang the intercom in his cell in an attempt to receive assistance. (Woodside Dep. at 18). There was no immediate response to this action. (Woodside Dep. at 18). Eventually, Sergeant Travis Ward responded to Woodside's cell. (Woodside Dep. at 18). Ward asked Woodside what his problem was. (Woodside Dep. at 18). Woodside responded that he was dying and needed help. (Woodside Dep. at 18). Woodside does not recall what Sergeant Ward's response was to this request. (Woodside Dep. at 19).

During the course of the night, Woodside repeatedly kicked the door to his cell, causing Sergeant Ward to return to see what was the matter. (Woodside Dep. at 19). Sergeant Ward again asked Woodside what his problem was. (Woodside Dep. at 19). Woodside again responded that he needed medical attention. (Woodside Dep. at 19). Woodside claimed he was told, "Well if you kick that . . . door again, you're going to get some help." (Woodside Dep. at 19).

Despite this admonition, Woodside continued to kick the door to his cell. (Woodside Dep. at 21). Woodside claims that in response to the continued disturbance, four deputy sheriffs responded to his cell. (Woodside Dep. at 21). After entering Woodside's cell, three of the deputy sheriffs grabbed Woodside and slammed him against the right side of his cell. (Woodside Dep. at 21). While the three officers were holding Woodside against the wall of his cell, the fourth deputy sheriff removed the mattress from the bunk in Woodside's cell. (Woodside Dep. at 21). After the mattress was removed, Woodside claims Sergeant Ward placed a handcuff on Woodside's left wrist and chained the other end of the handcuff to a hole cut in the base of the cell's steel bunk. (Woodside Dep. at 22). The deputy sheriffs exited the cell and left Woodside handcuffed to the bunk for the duration of the night. (Woodside Dep. at 25, 27).

The following morning [June 19, 2002}, Woodside was taken to his first appearance. (Woodside Dep. at 28-29). First Sergeant Noreen Walls observed Woodside upon his arrival for the first appearance. (Walls Dep. at 4). First Sergeant Walls observed Woodside walking with a limp, but did not notice any blood, cuts, or bruises on Woodside. (Walls Dep. at 4-5). First Sergeant Walls overheard an exchange between Woodside and the Clerk of Court in which Woodside stated he

had been in an accident the prior evening. (Walls Dep. at 5). Based upon her observation of Woodside's limp, First Sergeant Walls asked Deputy G. Wayne Mills, also in attendance at First Appearances, to find a judge who would issue Woodside an unsecured bond. (Walls Dep. at 5).

Deputy Mills briefly spoke with Woodside. (Mills. Dep. at 7-8). Woodside indicated to Mills that he had been in an accident the previous night and was now in pain. (Mills Dep. at 8). After this conversation, Deputy Mills spoke with First Sergeant Walls and proceeded to the Iredell County Courthouse to find a judge to issue an unsecured bond for Woodside. (Mills Dep. at 8). After locating a judge, Deputy Mills informed the judge of the circumstances of Woodside's incarceration and that Woodside needed to be released so that Woodside "could go on his own to the hospital and seek medical treatment." (Mills Dep. at 8). During the course of his interaction with Woodside, Deputy Mills did not observe any blood, cuts, wounds, or bruises on Woodside's body. (Mills Dep. at 9-10).

While Deputy Mills was obtaining the unsecured bond, Judith Guy, at that time the Registered Nurse for the Iredell County Jail, met with Woodside. (Guy Aff. at ¶¶ 2 & 3). Woodside informed Nurse Guy that he had been in an automobile accident the previous evening and was now experiencing pain. (Guy Aff. at ¶ 4). Nurse Guy inquired whether Woodside had already received medical treatment; Woodside responded that he had been offered treatment, but had refused the offered treatment. (Guy Aff. at ¶ 5). Nurse Guy proceeded to conduct a brief examination of Woodside in an attempt to determine the cause of his discomfort, but she was unable to do so. (Woodside Dep. at 31-32; Guy Aff. at ¶ 6). Because she was unable to determine the cause of Woodside's discomfort, Nurse Guy informed the officers on duty that Woodside would need to go to the local hospital for evaluation and possible treatment. (Guy Aff. at ¶ 6). After Woodside assured Nurse Guy that he truly intended to go to the hospital, Nurse Guy recommended to First Sergeant Walls that Woodside be released on unsecured bond. (Guy Aff. at ¶ 7-8; Walls Dep. at 6). During the course of her examination of Woodside, Nurse Guy did not observe anything which indicated to her that Woodside had been spitting up blood or was having difficulty breathing. (Guy Aff. at 9).

After being released on unsecured bond, Woodside left the Iredell County Jail and walked to the front entrance of the Iredell County Courthouse. (Woodside Dep. at 33). Once at the front of the Courthouse, Woodside encountered a security guard. (Woodside Dep. at 33). Woodside requested that the guard call the paramedics to take him to the hospital. (Woodside Dep. at 33). When the paramedics arrived, Woodside informed them that he had been in a motorcycle accident the previous evening and needed to go to the hospital. (Woodside Dep. at 33). Woodside claims that at the time he was treated by the paramedics, he was still wearing the blood soaked clothes he wore at the jail and was covered in "contusions." (Woodside Dep. at 35). However, the Iredell County EMS Ambulance Call Report which recites Woodside's treatment indicates that Woodside was not bleeding and that his only injury was a scratch to his right cheek. (Attachment 9). Moreover, the Ambulance Call Report indicated "no swelling or bruising noted to flank area of pain." (Attachment 9).

Upon Woodside's arrival at the Iredell Memorial Hospital, Woodside underwent a CT scan of his head, chest, and abdomen. (Roark Dep. at 10). The CT scan of Woodside's head did not show any serious medical injury. (Roark Dep. at 11-13). The CT scan of Woodside's chest did not reflect any serious medical problems. (Roark Dep. at 14). The CT scan of Woodside's chest showed no evidence of a rib fracture or blood in Woodside's chest. (Roark Dep. at 14-15). The CT scan of Woodside's abdomen showed "a small splenic laceration to the posterior aspect of [Woodside's] spleen…. [and] a small, subcapsular hematoma." (Roark Dep. at 15-16).

Based upon the injury to Woodside's spleen, Dr. Roger L. Roark, the doctor on-call for general surgery at the Iredell Memorial Hospital on June 19, 2002, was called for a consultation. (Roark Dep. at 9). Upon arrival at the Iredell Memorial Hospital Emergency Room, Dr. Roark examined Woodside, took his medical history, and reviewed the CT scans. (Roark Dep. at 25-26). Dr. Roark's medical history did not reflect that Woodside was caked in blood – contrary to

Woodside's claim – upon his arrival to the Iredell Memorial Hospital. (Roark Dep. at 39). In the event a patient arrived caked in blood, a record would have been made of this fact. (Roark Dep. at 8). Additionally, there is no record that Woodside spit up blood during his stay at the Iredell Memorial Hospital. (Roark Dep. at 39). Dr. Roark did not observe any evidence of external trauma. (Roark Dep. at 39).

A review of the pertinent information indicated that Woodside was suffering from a Class Two splenic laceration. (Roark Dep. at 16). In patients presenting with a Class Two splenic laceration, "90 percent of the time you're going to be able to manage [the patient] safely without… doing anything." (Roark Dep. at 35).

Roark determined that Woodside should be admitted to the Iredell Memorial Hospital for observation and to treat Woodside "non-operatively for a documented splenic laceration." (Roark Dep. at 27). Three days after Woodside was admitted, a second CT scan was conducted, to determine the cause of a decrease in Woodside's hemoglobin level. (Roark Dep. at 29). This second CT scan indicated a significant change in the condition of Woodside's spleen necessitating a spleenectomy. (Roark Dep. at 30). The spleenectomy was performed on June 23, 2002. (Roark Dep. at 33).

(*See* Defs.' Mem. In Supp. at 2-8.)

### III.  Standard

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Anderson v. Liberty Lobby, 477 U. S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); Celotex Corp. v. Catrett, 477 U. S. 317, 106 S. Ct. 2548,

91 L. Ed. 2d 265 (1986).

  In ruling on a motion for summary judgment, the Court must view the facts and inferences, in the light most favorable to the party opposing the motion for summary judgment. Celotex Corp., 477 U.S., at 325; Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). "When, however, the evidence from the entire record could not lead a rational fact-finder to find for the non-moving party, no genuine issue for trial exists and summary judgment is appropriate." Matsushita, 475 U.S. at 587.

### IV. Analysis

  Plaintiff argues that genuine issues of material fact preclude summary judgment on the following issues: 1) whether Defendants were deliberately indifferent to a serious medical need; 2) whether Plaintiff suffered more than a *de minimis* injury as a result of the alleged excessive force employed by Defendants; and 3) whether Defendants are entitled to qualified immunity. The Court disagrees and finds that summary judgment must be granted in favor of Defendants.

### a. Deliberate Indifference To Serious Medical Need

  "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U. S. 97, 106, 97 S. Ct. 285 (1976); Bell v. Wolfish, 441 U.S. 520, 545, 99 S.Ct. 1861 (1979)(pretrial detainees are protected under the Due Process Clause of the Fourteenth Amendment); Whisenant v. Yuam, 739 F.2d 160, 163 n. 4 (4th Cir.1984)(Eighth Amendment standard set forth in Estelle may be used to determine pretrial detainee's claim of due process violation). The inmate must establish the official knew of and disregarded an excessive risk of inmate health or safety to be considered deliberately

indifferent.  <u>Farmer v. Brennan</u>, 511 U.S. 825, 837, 114 S.Ct. 1970 (1994); <u>Odom v. S. Carolina Dep't of Corrs.</u>, 349 F.3d 765, 770 (4th Cir.2003)(explaining that the "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.")

A constitutional claim for denial of medical care has both objective and subjective components.  <u>Farmer</u>, 511 U.S. at 834.  In order to establish a Fourteenth Amendment violation for deliberate indifference to serious medical needs, Plaintiff must show 1) that the alleged deprivation was sufficiently serious, and 2) that the defendants acted with deliberate indifference.  <u>Wilson v. Seiter</u>, 501 U. S. 294, 299 n. 1, 111 S. Ct. 2321 (1991); <u>Bell</u>, 441 U.S. at 545; <u>Riley v. Dorton</u>, 115 F.3d 1159 (4th Cir.1997).

A serious medical need exists if the inmate is able to show "he is incarcerated under conditions posing a substantial risk of serious harm."  <u>Farmer</u>, 511 U.S. at 834.  "[A] medical need is objectively serious if it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.""<u>Blackmore v. Kalamazoo County</u>, 390 F.3d 890, 897 (6th Cir. 2005)(<i>citing</i> <u>Harden v. Green</u>, 27 Fed. Appx. 173, 2001 WL 1464468, at *3 (4th Cir. 2001)).

As a preliminary matter, the Court considers whether the record supports a finding that Plaintiff suffered from an objectively serious medical need.  Because Plaintiff was <u>not</u> diagnosed with a splenic injury <i>prior</i> to being placed in custody, the first issue presented is whether Plaintiff's medical condition was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  <u>Kalamazoo County</u>, 390 F.3d at 897. Despite Plaintiff's subjective description, the record, taken as a whole, reveals that

Plaintiff's injury was far from obvious.

Plaintiff, who was admittedly inebriated, testified that forty-five minutes to an hour after being placed in the cell, he "started having excruciating pain across [his] midsection . . . and it was cutting [his] oxygen off." (Woodside Dep. at 16-17.) Plaintiff further testified that he "went to spit in the commode" and was "spewing blood." (Woodside Dep. at 17.) Plaintiff stated he spit up a "pretty good bit" of blood. (Id.) When asked whether he got any blood on his clothes, Plaintiff stated that his "clothes were bloody from the accident" and that the next morning when he got to the hospital, he "had blood all over [him]." (Id.) Plaintiff explained that he also had contusions and cuts. (Id.)

Plaintiff claims that when he first began to experience these symptoms, he asked generally for help. (Woodside Dep. at 18.) As symptoms persisted, Plaintiff specifically alleges he was having difficulty breathing and was spitting up blood when he requested medical attention from the jailers. (Woodside Dep. at 25-26.) When Sergeant Ward, with whom Plaintiff was familiar,[4] eventually came to Plaintiff's cell, Plaintiff told Ward he "was dying." (Id.) According to Plaintiff, there were multiple exchanges between various jailers, including Ward and Plaintiff. Plaintiff contends he ultimately became hysterical after "seeing all this blood" and started kicking the cell door. (Woodside Dep. at 19.) Plaintiff alleges he repeatedly asked to be taken to the hospital. (Woodside Dep. at 25-26.)

Sergeant Ward's description of events is quite different from Plaintiff's version. Ward's only comments specific to Plaintiff's physical complaints are as follows:

---

[4] Plaintiff Woodside was familiar with Sergeant Ward due to the number of times Plaintiff had previously been arrested and housed in the Iredell County Jail, as well as seeing Ward occasionally in the community. (Woodside Dep. at 19-20; Ward Dep. at 4.)

"[Woodside] later on stated that his ribs were hurting. I advised him that the nurse had already left and that she would be in in the morning. And he laid down, and I gave him an aspirin to help his side."

(Ward Dep. at 7; Ward's 7-31-02 Statement)    With respect to the remainder of the evening, Ward testified that there are windows on the cell doors and that detention officers regularly check on inmates by making two scans an hour. (Ward Dep. at 8.) Ward testified that when he checked on Plaintiff, Plaintiff was "[j]ust laying on the bunk sleeping." (Id.) Ward further testified that he did not recall Plaintiff yelling or banging on the walls; that once Plaintiff was placed in the holding cell, he was not taken out again; that he did not recall seeing any blood on Plaintiff's clothes; that he never saw Plaintiff throw up; and that he never went into Plaintiff's holding cell and restrained him. (Ward Dep. at 7- 8.)  Ward does not specifically address whether deputies ever phoned a doctor or nurse on call for advice, or whether he or other jailers considered taking Plaintiff to the emergency room, although according to his testimony, there would not have been any need to discuss taking any of these measures. The record is silent as to the other individuals (including Corporal Murphy) who actually observed and / or encountered Plaintiff that night.[5]

The following morning, Plaintiff states he told everyone he saw he needed help. (Woodside Dep. at 30.)  At that point, Plaintiff had no idea what was physically wrong with him, but "knew whatever it was was serious."  (Woodside Dep. at 42.)   According to Plaintiff, his clothes (sleeveless shirt and shorts) were covered with blood and he had blood "caked" on him (i.e., everywhere, arms, legs). (Woodside Dep. at 32, 35, 36.)  Plaintiff's testimony is not clear as to whether the blood he claims was on his clothes was due to the

_____

[5] Sergeant Ward confirmed that Corporal Murphy was, in fact, working that night.  (Ward Dep. at 8.)

accident, or due to his spitting up blood.  Plaintiff initially testified that his clothes were bloodied in the accident and stated it was "hard to say" whether blood got on his clothes during the alleged vomiting. (Woodside Dep. at 17.)  Plaintiff reportedly did not change his clothes upon his release from the Iredell County Jail and his subsequent request to call the paramedics.[6]  (Woodside Dep. at 34.)   In Plaintiff's view, because the jailers knew he had been in an accident, and because he had been spitting up blood, it was "plain to see" that he needed medical attention.  (Woodside Dep. at 41.)

Hospital records[7] indicate that upon initial exam, there were no signs of external trauma.  (Roark Dep. at 11, 39)  However, a CT Scan revealed a "small splenic laceration to the posterior aspect of his spleen" and a small subcapsular hematoma.[8]  (Roark Dep. at 15-16; Exh. 3)   A chest CT indicated minimal bibasilar atelectasis, which means that Plaintiff's lungs were not completely expanded.  (Roark Dep. at 14.)   Further observation and monitoring of Woodside's hemoglobin levels over the next few days revealed that Plaintiff was continuing to experience internal bleeding, indicating that the spleen had ruptured and was not healing on its own.  (Roark Dep. at 29-31; Exh. 4)  Four days later,

---

[6] Although neither party expressly says so, you can infer from Plaintiff's testimony that Plaintiff remained in his personal clothes and was not required to put on an orange jumpsuit or similar jail attire.

[7] In determining whether prison officials are deliberately indifferent to a prisoner's serious medical needs, the court may generally rely on medical records concerning examination and treatment of the prisoner.  Wynn v. Correctional Officer Mundo, et al., 367 F.Supp.2d 832, 838 (M.D.N.C. 2005) (citing Bennett v. Reed, 534 F.Supp. 83, 87 (E.D.N.C. 1981), aff'd, 676 F.2d 690 (4th Cir.1982)).

[8] The subcapsular hematoma means that there is "a little expansion consistent with some blood which is being still confined to the splenic capsule but is expanding the stomach." (Roark Dep. at 16.)

on June 23, 2002, Plaintiff underwent a spleenectomy.[9] (Roark Dep. at 33.)

_____Defendants concede that a factual issue exists as to whether Plaintiff Woodside's arms and legs were "caked" in blood, but contend that this factual issue is immaterial in light of the other evidence.  In other words, Defendants argue that no *reasonable* juror could find in favor of the Plaintiff in light of the evidence presented in support of summary judgment.  Defendants produce the following evidence in support of their contention that Plaintiff's injury would not have been apparent to a layperson:

- North Carolina Highway Patrol Trooper R.D. Smith avers that Woodside's "attitude and demeanor were no different from any other individual who is under the influence of an impairing substance"; and that the only physical injury he observed was a scratch on Plaintiff's face.  (Smith Aff. ¶¶11, 12)

- First Sergeant Noreen Walls testified that she didn't observe anything about Woodside's clothing; she didn't observe any blood, cuts, bruising or anything of that nature; and that Plaintiff did not indicate he needed to throw up. (Walls Dep. at 4-5.)

- Deputy G. Wayne Mills, who had known Plaintiff from school and as a result of his law enforcement career, testified that Woodside's appearance was "normal, with the exception of he was holding his head down and talking in a low voice." (Mills Dep. at 9.)   According to Mills, Plaintiff was not caked with blood.  (Id.)  Mills further testified that he did not recall any blood on Plaintiff's clothes, nor any apparent cuts, wounds or bruises. (Mills Dep. at 9-10.)

- Judith Guy, Registered Nurse at the Iredell County Jail,  examined Woodside the morning after his arrest and avers she was unable to determine the cause of Woodside's pain or the severity of any injury he had suffered; and Woodside had been spitting up blood.  (Guy Aff. ¶¶2, 4, 6, 9)

- Dr. Roger L. Roark's notes documenting Woodside's patient history and

_____

[9] In ruling on Defendants' motion to dismiss, the Court found that Plaintiff alleged facts from which a reasonable juror could find that he suffered from sufficiently serious injuries – ruptured spleen, broken ribs, head injury and internal bleeding.  (*See* Am. Compl., ¶¶13, 14)  As it turns out, based on summary judgment materials, Plaintiff did not break any ribs or sustain any serious head injury as alleged within the Amended Complaint.  (Roark Dep. at 11, 14-15, 39; Exhs. 1, 2)

physical exam of July 19, 2002 do not indicate that Plaintiff was caked in blood.  (Roark Dep. at 25-28; Exh. 4)

- Dr. Roark testified that a splenic laceration such as Woodside's would not cause an individual to vomit or spit up blood unless there was some other concomitant injury to the stomach.  (Roark Dep. at 24.)   Roark opined that Woodside did not sustain any such stomach injury.  (Id. at 24-25, 38.)

- Dr. Roark testified that splenic injury is typically diagnosed via CT scan of the abdomen; and that there are "no outward signs, which would indicate to a lay person that an individual was suffering from a lacerated spleen."  (Roark Dep. at 20-23, 39.)

- The Ambulance Call Report dated June 19, 2002 (the morning after Plaintiff allegedly "spewed" blood), states that Woodside was not bleeding and that the only visible injury was a scratch on his right cheek.  The report expressly indicates, "no swelling or bruising noted to flank area of pain."  (Defs.' Attachment 9)

Other federal district courts that have addressed complaints of deliberate indifference in the context of splenic injuries have arrived at different conclusions - conclusions largely driven by the specific facts of the case, and understandably so.   In the Western District of Wisconsin, summary judgment was granted in favor of defendants where the inmate was diagnosed with an injury to the spleen after his release.   *See* Froiseth v. La Crosse, 2006 WL 1236714, **11-13 (W.D.Wis. May 1, 2006) (applying Wisconsin statute requiring correction facilities to provide "appropriate" medical or hospital care or treatment).   In Froiseth, like the instant case, plaintiff was held in custody overnight and experienced a relatively short delay in treatment.   Froiseth, 2006 WL 1236714, **11-13.  Plaintiff's chief complaints were difficulty breathing and pain in the chest and rib area. The court noted the absence of any outward signs of life threatening injury.   However, the defendant jailers consulted with a doctor on call via phone in response to plaintiff's complaints as opposed to ignoring the complaints altogether.   The court noted that a

lacerated spleen cannot be diagnosed with a physical examination and that a CT scan or ultrasound, equipment the jail did not have onsite, is required. The plaintiff's spleen healed on its own although plaintiff was hospitalized for a week, bedridden for a month, and prescribed morphine for pain. The trial court determined that the jailers did not appreciate the full extent of the injury.

In a case arising out of the Northern District of Illinois, the federal district court denied defendants' motion for summary judgment on plaintiff's deliberate indifference claim, finding that a reasonable jury could reject defendants' claim that they did not have actual knowledge of plaintiff's injuries where plaintiff was "screaming in pain, throwing up bile, walking bent over and extremely slowly." *See* El-Uri v. City of Chicago, 186 F.Supp.2d 844 (N.D. Ill. 2002). Plaintiff El-Uri, who had been drinking heavily earlier, was allegedly punched in the head and knocked to the floor by one of the defendant detectives and then kicked in the stomach and side while he lay on the floor. After the beating, plaintiff was told he was free to leave. El -Uri, 186 F.Supp.2d at 846-47. Defendants drove plaintiff home but did not seek any medical treatment on plaintiff's behalf. Id. A witness testified that plaintiff "half-walked, half crawled" out of the defendants' car. Id. at 847. Plaintiff was diagnosed and treated later the same day for a ruptured spleen. Id. The court determined that any reasonable person would have objectively known that plaintiff needed medical attention given the symptoms he was displaying. Id. at 848. Summary judgment was denied despite the fact that plaintiff did not complain of being hurt.[10]

---

[10] Plaintiff testified later that he did not tell anyone of his injury while at the police station due to his fear that he would be retaliated against if he complained or accused the defendant detective of beating him.

In this case, Plaintiff produces little medical or other objective evidence to support his own description of his physical appearance.[11]   Indeed, the weight of the evidence presented tends to discredit Plaintiff's entire version of events.  Plaintiff's hospital records, as well as the records of the other emergency personnel, note the absence of any external trauma.   According to Dr. Roark's testimony,   Plaintiff's splenic injury could not have possibly caused the symptoms Plaintiff complains of (*i.e.*, spitting up blood) absent a secondary stomach injury of some sort.   (Roark Dep. at 24.)  Dr Roark's testimony was that Plaintiff did not sustain any such stomach injury.   (Id. at 24-25, 38.)  Plaintiff fails to rebut this evidence.  For this reason, Plaintiff cannot establish the existence of a serious medical need.

_____The Court next briefly addresses Defendants' contention that the delay in medical treatment must cause "substantial harm" to Plaintiff in order to constitute deliberate indifference.   Defendants argue that a ten to twelve hour delay[12] does not constitute deliberate indifference as a matter of law since Plaintiff was deemed medically "stable" upon admission to the hospital.   In support, Defendants cite a case arising out of the Middle District of North Carolina the undersigned finds instructive. *See* Wynn, 367 F.Supp.2d at 838 (evaluating deliberate indifference to serious medical need under Eighth

_____

[11]   Accepting Plaintiff's allegations as true, the facts here fall somewhere between Froiseth and El-Uri.   After reviewing the entire summary judgment record, the Court believes this case is more analogous to the facts in Froiseth, where the court determined that the jailers could not have been expected to fully appreciate the nature of the splenic injury in that there were no outward signs indicating the plaintiff had sustained a life threatening injury.

[12]   Trooper Smith's reports indicate that the scooter accident occurred at approximately 6:50 p.m. and that *Miranda* warnings were given around 7:30 p.m.  (Defs.' Exh. 9)  Plaintiff testified that he began to ask for medical attention in the early evening, or between 5:30 p.m. and 7:00 p.m.,  and was eventually uncuffed at approximately 5:45 a.m. the following morning. (Woodside Dep. at 26-27.)

Amendment), *aff'd by unpublished per curiam opinion*, COA No.: 05-6359 (4th Cir. September 1, 2005). In Wynn, Judge Bullock held that "delay in the receipt of medical care only constitutes deliberate indifference where the plaintiff can show that the delay caused substantial harm." Wynn, 367 F.Supp.2d at 838. In so ruling, Judge Bullock relied on cases from the Fifth, Eighth, and Tenth Circuits. Id. (*citing* Mendoza v. Lynaugh, 989 F.2d 191, 195 (5th Cir.1993); Beyerbach v. Sears, 49 F.3d 1324, 1326 (8th Cir.1995), *abrogation on other grounds recognized by* Reece v. Groose, 60 F.3d 487 (8th Cir.1995); Olson v. Stotts, 9 F.3d 1475, 1477 (10th Cir.1993)).

In Martin v. Gentile, the Fourth Circuit mentioned the length of delay, noted that there was no suggestion that delay exacerbated plaintiff's injuries, and commented that a fourteen-hour delay did not amount to deliberate indifference where the injuries consisted of a cut over one eye, a quarter-inch piece of glass embedded in the palm, and bruises on plaintiff's shoulders and elbows. *See* Martin v. Gentile, 849 F.2d 863, 871-72 (4th Cir.1988). Thus, the Martin panel considered delay one of several relevant factors in determining whether defendants' actions were done with a specific intent or purpose to punish. Id. The Fourth Circuit has never expressly held that delay in treatment must give rise to an *additional* substantial harm in order for a plaintiff to demonstrate deliberate indifference. While this Court agrees that the delay complained of is a factor to consider in evaluating deliberate indifference, the undersigned is not entirely convinced that delay in treatment (and subsequent attendant harm) is an *additional* criterion that must be proven by the Plaintiff.[13]

_____

[13] It seems a better rule might consider generally the nature of the alleged deprivation (*i.e.*, the length of delay and other circumstances giving rise to delay in treatment measured

In any event, Plaintiff does not seriously contend that his splenic injury was exacerbated by delay in treatment, and there is no support in the record for any such contention. Based in part upon the short period of delay in treatment, and the fact that Plaintiff was stable upon admission to the hospital, the Court finds that the alleged deprivation was not sufficiently serious and, therefore, does not rise to the level of a constitutional violation. The Court further finds that Plaintiff has not presented evidence from which a reasonable jury could find that Defendants were deliberately indifferent. Notwithstanding the factual questions Plaintiff insists preclude summary judgment, the overwhelming objective evidence makes clear that Defendants could not have fully appreciated the nature and extent of Plaintiff's injury.[14] Defendant's motion will be granted with respect to this claim.

### b. Excessive Force

Plaintiff's excessive force claim is likewise governed by the Due Process Clause of the Fourteenth Amendment. Riley, 115 F.d at 1166. Thus, the Court considers whether Defendants "inflicted unnecessary and wanton pain and suffering." Taylor v. McDuffie, 155 F.3d 479, 483 (4th Cir.1998); Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865 (1989). "The proper inquiry is whether the force applied was in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm. " Taylor, 155 F.3d at 483. This analysis contemplates both an objective and subjective

---

against the severity of the alleged injury whether arising solely from the alleged delay or not).

[14] Alternatively, for the same reasons, qualified immunity surely protects Defendants in that Plaintiff's factual allegations regarding deliberate indifference do not support a finding that Defendants violated a "clearly established constitutional right." (*See* Section "IV, c")

component.  Id.  "Under the objective component, the Court is asked to determine whether the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation."  Norman v. Taylor, 25 F.3d 1259, 1262 (4th Cir. 1994) (en banc) (quoting Hudson v. McMillian, 503 U.S. 1, 8 (1992); Wilson v. Seiter, 501 U.S. 294, 302 (1991)).

As a general rule, Plaintiff cannot prevail if the conduct complained of resulted only in de minimis  injury.  "The de minimis injury exception stems from the recognition that there is a de minimis level of imposition [of punishment] with which the Constitution is not concerned."  Carr v. Deeds, 453 F.3d 593, 606 n. 4 (4th Cir. 2006) (noting that this rule extends to pretrial detainee claims of excessive force) (citing Riley, 115 F.3d at 1166.) "Although the Constitution does "not require that an injury be serious or leave visible marks or scars" to be actionable, we held that "deminimis injury can serve as conclusive evidence that deminimis force was used."" Id. (citing Riley, 115 F.3d at 1168 (quoting Norman, 25 F.3d at 1261.)) Significantly, the Fourth Circuit recently explained, "Even if there is a genuine issue of material fact as to whether Defendants behaved maliciously or sadistically after the need for force has subsided," plaintiff must also demonstrate that the injuries were "more than deminimis or that "the force used is of a sort repugnant to the conscience of mankind . . . or the pain itself [is] such that it can properly be said to constitute more than deminimis injury.""[15]  See Carr, 453 F.3d at 605-606 (quoting Norman, 25 F.3d at1263 n.

---

[15]

The way the Circuit Court explains it, there may be occasion where the injury itself is de minimis, but the force used, or the pain endured, are such that de minimis injury does not defeat the cause of action.  Norman, 25 F.3d at 1264 n. 4.  These two situations would create exceptions to the exception.  Neither scenario is present here.  Rather, Plaintiff's own evidence tends to show that the physical encounter was precipitated by Plaintiff's continuous kicking of the cell door and initiated by the deputies, presumably, for the purpose of quieting Plaintiff and restoring order.  To the extent the mattress was removed from the bunk to punish, removal of the mattress hardly rises to the level of a constitutional harm.  Secondly, the force Plaintiff describes would not constitute

4.)

Defendants contend that Plaintiff only suffered a *de minimis* injury at the hands of the jailers.[16] The records supports Defendants' argument on this issue. Dr. Roark opined in his deposition that Woodside's spleen injury was likely caused by the motorscooter accident and just took a few days to "play out."[17] (Roark Dep. at 36.) Plaintiff Woodside is of the same opinion given that his symptoms allegedly began shortly after being taken into custody and not following the alleged physical encounter with the deputies.[18] (Woodside Dep. at 43.) It is also undisputed that Plaintiff was "stable" upon admission to the hospital and did not require surgery until days later. Because Plaintiff appears to concede that his splenic injury may not be attributed to the alleged physical encounter at the jail, and because the nature of force chosen and applied by the jailers may also be characterized in context as *de minimis*, the Court will grant summary judgment in favor of

---

a force "repugnant to the conscience of mankind." Most importantly, there is no evidence before the Court that Plaintiff's restraint in this manner contributed in any way to Plaintiff's splenic injury, or the symptoms (*e.g.*, pain) Plaintiff complains of.

[16] Significantly, Defendants do not contend that excessive force did not occur as a matter of law. Sergeant Ward denied the alleged physical encounter altogether. (Ward Dep. at 8.) However, Defendants have no obligation to refute Plaintiff's allegations in the context of an excessive force claim. Carr, 453 F.3d at 608 (holding that defendant "bore no burden to produce an affidavit denying plaintiff's allegations or to otherwise support his motion for summary judgment with materials negating the claim of an unconstitutional use of force).

[17] Dr. Roark's opinion, while not conclusive, also tends to support Defendants' argument regarding the length of delay and Plaintiff's failure to demonstrate substantial harm due to the delay in treatment.

[18] In ruling on Defendants' motions to dismiss, the Court noted that, if Plaintiff were able to prove what he alleged, it would not be unreasonable to infer that the force of multiple jailers grabbing Plaintiff and slamming him into a wall either resulted in injury, or exacerbated an already existing injury. Plaintiff appears to have abandoned any argument that the force used by the jailers exacerbated his injuries - likely due to the extant medical record.

Defendants with respect to Plaintiff's excessive force claim.

### c. Qualified Immunity

As an alternative basis for the Court's ruling, qualified immunity requires dismissal of Plaintiff's action. Qualified immunity shields government officials performing discretionary functions from civil damages liability as long as the officials' conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U. S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982); Pinder v. Johnson, 54 F.3d 1169, 1173 (4th Cir.1995)(*en banc*). Qualified immunity reflects the concern that civil damages awards against public officials for every judicially determined violation of constitutional rights would prove too expensive to the public, discourage public service employment, and impair governmental decision-making. Id. at 814. Qualified immunity "protects law enforcement from 'bad guesses in gray areas' and ensures that they are liable only 'for transgressing bright lines.'" Trulock v. Freeh, 275 F.3d 391, 399 (4th Cir. 2001) (motion to dismiss) (*internal citations omitted*). "Immunity applies to "all but the plainly incompetent or those who knowingly violate the law."" Id. (*quoting* Malley v. Briggs, 475 U.S. 335, 341 (1986)).

The framework for a qualified immunity analysis: 1) first identifies the specific right that the plaintiff asserts was infringed by the challenged conduct at a high level of particularity; 2) considers whether at the time of the claimed violation that right was clearly established; and 3) analyzes whether a reasonable person in the official's position would have known that his conduct would violate that right.

For a right to have been clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates

that right." <u>Anderson v. Creighton</u>, 483 U.S. 735, 640 (1987).  In determining whether a

right  is clearly established, the court focuses on the "objective legal reasonableness" of

the action as opposed to the state of mind of the officials in question.  <u>El-Uri</u>, 186

F.Supp.2d at 849 (*quoting* <u>Anderson</u>, 483 U.S. at 639).  A plaintiff can show a right was

clearly established by invoking a "closely analogous case that has already established both

the right at issue and its application to the factual situation at hand, . . .  or show that the

violation was so obvious that a reasonable person would necessarily have known about

it."  <u>Id.</u> (*internal citations omitted*)

In determining whether the constitutional right asserted was clearly established at

the time,  courts are directed to  "focus upon the right [not] at its most general or abstract

level, but at the level of its application to the specific conduct being challenged."  <u>Trulock</u>,

275 F.3d at 400.   Viewing the disputed facts in the light most favorable to Plaintiff,[19]

Plaintiff fails to produce evidence from which a reasonable jury could find that Defendants

demonstrated a deliberate indifference to a serious medical need in violation of the Due

Process Clause of the Fourteenth Amendment.   On this record, the Court finds as a matter

of law that the specific allegations of deliberate indifference do not constitute a violation of

---

[19] There is some question as to whether the Court is required to accept Plaintiff's version
of the facts in light of the summary judgment record.  In a recent opinion, the Supreme Court
held that, "[w]hen opposing parties tell two different stories, one of which is blatantly
contradicted by the record, so that no reasonable jury could believe it, a court should not adopt
that version of the facts for purposes of ruling on a motion for summary judgment."  *See* <u>Scott
v. Harris</u>, 127 S.Ct. 1769, 1776 (2007) (also noting that in qualified immunity cases, application
of the summary judgment standard "usually means adopting . . . the plaintiff's version of the
facts.")  However, in <u>Scott v. Harris</u>, plaintiff's allegations were directly contradicted by concrete
evidence, namely, "a videotape capturing the events in dispute."  <u>Scott</u>, 127 S.Ct. at 1775.
Significantly, the plaintiff did not challenge the authenticity or accuracy of the videotape.   <u>Id.</u>
The Supreme Court opined that respondent's version of events was "so utterly discredited by
the record that no reasonable jury could have believed him."  <u>Id.</u> at 1776.  The court held that it
was error for the lower court to rely upon "such visible fiction."  <u>Id.</u>

"a clearly established constitutional right."  *See* <u>Gooden v. Howard County, Maryland</u>, 954 F.2d 960, 965-66 (4th Cir. 1992) (factual disputes did not preclude grant of summary judgment in favor of defense based upon qualified immunity where there was no genuine issue of fact regarding the reasonableness of the officers' perception).  At best, the facts presented by Plaintiff fall within a gray area as opposed to an alleged violation of a bright line rule of law.

**VI.  Conclusion**

**IT IS, THEREFORE, ORDERED** that Defendants' Motion For Summary Judgment is **GRANTED**.  Plaintiff's claims of excessive force and deliberate indifference to a serious medical need are hereby <u>dismissed</u>.

Signed: December 19, 2007

Richard L. Voorhees
United States District Judge